1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| DANIEL RAMIREZ MEDINA, | CASE NO. 2:22-CV-106 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

1    Attorneys for Plaintiff

2    PUBLIC COUNSEL
     MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice* forthcoming
3      mrosenbaum@publiccounsel.org
     JUDY LONDON (CA SBN 149431), *pro hac vice* forthcoming
4      jlondon@publiccounsel.org
     KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice* forthcoming
5      keidmann@publiccounsel.org
     610 South Ardmore Avenue
6    Los Angeles, CA 90005
     Telephone: (213) 385-2977
7    Facsimile: (213) 385-9089

8

9    GIBSON, DUNN & CRUTCHER LLP
     THEODORE J. BOUTROUS, JR. (CA SBN 132099), *pro hac vice* forthcoming
       tboutrous@gibsondunn.com
10   KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice* forthcoming
       kmarquart@gibsondunn.com
11   SARAH M. KUSHNER (CA SBN 320077), *pro hac vice* forthcoming
       smkushner@gibsondunn.com
12   333 South Grand Avenue
     Los Angeles, CA 90071-3197
13   Telephone: (213) 229-7000
     Facsimile: (213) 229-7520
14
     ETHAN D. DETTMER (CA SBN 196046), *pro hac vice* forthcoming
15     edettmer@gibsondunn.com
     THAD A. DAVIS (CA SBN 220503), *pro hac vice* forthcoming
16     tdavis@gibsondunn.com
     KELSEY J. HELLAND (CA SBN 298888), *pro hac vice* forthcoming
17     khelland@gibsondunn.com
     555 Mission Street
18   San Francisco, CA 94105
     Telephone: (415) 393-8200
19   Facsimile: (415) 393-8306

20   NOVO LEGAL GROUP, PLLC
     LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice* forthcoming
21     luis@novo-legal.com
     19309 68th Avenue South, Suite R-102
22   Kent, WA 98032
     Telephone: (206) 212-0260
23   Facsimile: (206) 212-0360

24   NORTHWEST IMMIGRANT RIGHTS PROJECT
     MATT ADAMS (SBN 28287)
25     matt@nwirp.org
     615 Second Ave., Suite 400
26   Seattle, WA 98104
     Telephone: (206) 957-8611
27

28

Complaint                                          Counsel Listed on Page I
Case No. 2:22-cv-106

## COMPLAINT

Plaintiff Daniel Ramirez Medina ("Mr. Ramirez") brings this Complaint against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), to remedy the federal government's unlawful and tortious arrest, detention, and mistreatment of Mr. Ramirez, stating as follows:

## INTRODUCTION

This action seeks damages for the inhumane and cruel treatment of Mr. Ramirez while he was in the custody of the United States government and subject to a prolonged, harassing legal process initiated by the government. On February 10, 2017, Immigration and Customs Enforcement ("ICE") officers unlawfully arrested Mr. Ramirez without a warrant or probable cause, and detained him for more than six weeks without justification, in violation of his constitutional rights. He was verbally abused, coerced, isolated, forced to live in dangerous conditions, and discriminated against while in custody. In the ensuing legal proceedings, the government repeatedly leveled false accusations of gang membership and affiliation against Mr. Ramirez in an attempt to cover up for these misdeeds, and even went so far as to strip Mr. Ramirez of his DACA status despite knowing these accusations were false.

The federal government established the Deferred Action for Childhood Arrivals ("DACA") program with great fanfare in 2012. Under DACA, individuals brought to the United States as children who meet certain criteria, and who are found by the Department of Homeland Security ("DHS") to pose no threat to public safety or national security, are granted deferred action for a two-year period, subject to renewal. These young people are commonly referred to as "Dreamers" in recognition that they have played by the rules, cooperated with the government, and are working hard to be part of the American Dream. Mr. Ramirez is one of these Dreamers.

The government targeted Mr. Ramirez despite its knowledge that he is a "Dreamer" who was twice granted deferred action and work authorization under DACA after rigorous vetting. Without cause or provocation, the government handcuffed him, forcibly removed him from a private residence, and transported him to an ICE detention facility where he was coercively interrogated. Instead of admitting that it erred in arresting and detaining him, the government subsequently summarily revoked his DACA status and work authorization without notice, justification, or due process, and detained him

with dangerous criminals for more than six weeks.  The government then repeatedly falsely asserted that he was gang-affiliated, notwithstanding the total absence of any credible evidence to support that allegation, and continued to press for his removal long after it concluded that he posed no danger to the community.

The government has "pursued a nearly three-year vendetta" against Mr. Ramirez despite the fact he "is American in all ways but legal status."  *Ramirez Medina v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 1224, 1226, 1240 (W.D. Wash. 2019).  As a result of the government's tortious and unconstitutional conduct, Mr. Ramirez was forcibly separated from his family, locked in a detention center for more than six weeks, publicly and falsely branded as a gang member, made to fear for his safety and well-being, denied the opportunity to earn an income, and forced to endure other mistreatment, all of which caused him to experience psychological and emotional distress.  Even today, he continues to experience profound emotional and psychological consequences of his arrest, detention, and reputational damage in the form of stigma from being falsely associated with a gang.

Mr. Ramirez asks this Court to remedy the government's tortious and unconstitutional actions by awarding monetary damages in the amount of at least $450,000 resulting from the harm that Mr. Ramirez suffered when ICE and other DHS personnel committed the following torts against him: (1) false arrest; (2) false imprisonment; (3) abuse of process; (4) intentional infliction of emotional distress; and (5) negligent infliction of emotional distress.

### JURISDICTION AND VENUE

1. This Court has jurisdiction over Mr. Ramirez's claim for money damages against the United States pursuant to 28 U.S.C. § 1331 and § 1346(b)(1).

2. Mr. Ramirez has exhausted his FTCA administrative claims.  On May 25, 2017, Mr. Ramirez served by certified mail the relevant United States departments and agencies with a demand under the Federal Tort Claims Act, including a completed Standard Form 95.[1]  The government denied Mr. Ramirez's claims on October 13, 2020.[2]  Mr. Ramirez submitted a request for reconsideration on

---

[1] Ex. O (FTCA Letter); Ex. P (Standard Form 95).
[2] Ex. Q (ICE Denial Letter).

April 7, 2021.[3]  The government denied the request for reconsideration on July 30, 2021.[4]

3.      Venue properly lies within the Western District of Washington because a substantial part of the events or omissions giving rise to this action occurred in the District.   28 U.S.C. §§ 1391(e)(1), 1402(b).   Venue is also proper in this District under 28 U.S.C. § 1402(b) because Plaintiff resides in this District.

## PARTIES

4.      Mr. Ramirez is the twenty-eight-year-old father of an eight-year-old United States citizen.  Mr. Ramirez was brought to the United States from Mexico in or around 2003, when he was approximately 10 years old.  He was twice granted deferred action and work authorization under the DACA program.  After obtaining his work authorization, Mr. Ramirez worked picking oranges in California.  He moved to Washington in or around January 2017, in order to obtain more lucrative employment to better support his son.  Following his unlawful arrest, Mr. Ramirez was detained in the Northwest Detention Center for more than six weeks.  He successfully obtained release from custody after the government conceded he was not a threat to public safety, and later, on May 15, 2018, obtained an order from this District enjoining the government from terminating his DACA.  The government nevertheless improperly denied Mr. Ramirez's request to renew his DACA in December 2018.  Mr. Ramirez currently resides in Auburn, Washington.

5.      All federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, the Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Citizenship and Immigration Services ("USCIS").

6.      DHS is a cabinet department of the United States federal government with responsibility for, among other things, administering and enforcing the nation's immigration laws.

7.      ICE is a law enforcement agency that is part of DHS.  According to its website, "ICE's primary mission is to promote homeland security and public safety through the criminal and civil

---

[3]  Ex. R (Request for Reconsideration).

[4]  Ex. S (ICE Denial of Request for Reconsideration).

enforcement of federal laws governing border control, customs, trade, and immigration."[5]

8.      USCIS is a federal agency that is part of DHS.  According to its website, USCIS "is the government agency that oversees lawful immigration to the United States."[6]  USCIS administers the DACA program, including by processing applications and renewals, and issuing notices of termination.

9.      Defendant United States of America is a proper defendant under the FTCA.  *See* 28 U.S.C. §§ 1346(b), 2671, et seq.  Mr. Ramirez sues the United States for personal injuries caused by the wrongful acts or omissions of its employees, including employees of DHS, ICE, and USCIS. Those employees were acting within the scope of their employment under circumstances where the United States, if a private person, would be liable to Mr. Ramirez in accordance with the law of the place where the act or omission occurred.  *See* 28 U.S.C. § 1346(b).

## STATEMENT OF FACTS

**Establishment of the DACA Program and its Application Process**

10.      On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum").[7]  Under the DACA framework, individuals who were brought to the United States as young children and meet certain specific criteria may request deferred action for a period of two years, subject to renewal.  In exchange, DACA applicants are required to provide the government with highly sensitive personal information, submit to a rigorous background check, and pay a considerable fee.  The DACA program has been modified a number of times, but the program remains in place today,[8] and the government continues to accept and process DACA renewal applications.

11.      At the time when the government was processing new requests for deferred action

---

[5]  *See, e.g.*, *ICE Initiative to Increase Community Engagement*, U.S. Immigration & Customs Enforcement: News Releases (Mar. 10, 2016), https://www.ice.gov/news/releases/ice-initiative-increase-community-engagement.

[6]  United States Citizenship & Immigration Servs., *About Us*, https://www.uscis.gov/aboutus.

[7]  Ex. D, at 1 (Memorandum from Secretary Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012)) (hereinafter "2012 DACA Memorandum").

[8]  *See, e.g.*, Ex. E, at 2 (Memorandum from Secretary John Kelly, Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017)).

under DACA, first-time DACA applicants were required to submit extensive documentation establishing that they meet the above-mentioned criteria.[9]  Applicants were also required to submit a Form I-765 Application for Employment Authorization, and pay hundreds of dollars in fees.[10]

12.    DACA applicants were also required to undergo biometric and biographic background checks.  When conducting these checks, DHS reviewed the applicant's biometric and biographic information "against a variety of databases maintained by DHS and other federal government agencies."[11]  If any information "indicate[d] that [the applicant's] presence in the United States threatens public safety or national security," the applicant would be ineligible for DACA absent "exceptional circumstances."[12]

13.    Indicators that an individual poses a national security threat include "gang membership."[13]  Accordingly, "[a]ll DACA requests presenting information that the requestor is or may be a member of a criminal street gang are referred to the Background Check Unit (BCU)."[14]  If gang membership was confirmed, the DACA application was denied absent a determination by USCIS that an exception should be made given the totality of the circumstances.[15]

14.    USCIS evaluates renewal requests based on the same criteria as initial requests, and also requires that the renewal applicant (1) has not departed the United States on or after August 15, 2012 without advance parole; (2) has continuously resided in the United States since his or her most recent DACA request was approved; and (3) has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise "pose a threat to national security or public safety."[16]

---

[9]   Ex. B, at 9–15 (USCIS DACA FAQs, Questions 28–41).

[10]  *Id.* at 3 (USCIS DACA FAQs, Question 7); *see also* USCIS, I-821D, Consideration of Deferred Action for Childhood Arrivals, https://www.uscis.gov/i-821d (explaining that the filing fee for a DACA application is currently set at $495 and cannot be waived).

[11]  Ex. B, at 7 (USCIS DACA FAQs, Question 23).

[12]  *Id.* at 23 (USCIS DACA FAQs, Question 65).

[13]  *Id.*

[14]  Ex. F, at 1 (Letter from USCIS Director León Rodríguez to Senate Judiciary Committee Chairman Charles E. Grassley (Apr. 17, 2015)) (hereinafter, "USCIS Letter").

[15]  *Id.* at 2.

[16]  Ex. B, at 18 (USCIS DACA FAQs, Question 51).

15.     Once DACA has been granted, internal USCIS "Standard Operating Procedures" dictate that, absent an "Egregious Public Safety" issue, DACA status should not be revoked until the government has provided a "Notice of Intent to Terminate" which "thoroughly explain[s]" the grounds for the termination.[17]  DHS policy further provides that the recipients of such notice should be afforded 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of DACA status.[18]

16.     On July 16, 2021, a U.S. District Court held that the DACA program is unlawful, set aside the 2012 DHS Memorandum, and remanded DACA back to DHS to take steps to comply with the court's order.[19]  However, the court stayed its order with regard to people who already have DACA status, and permitted new DACA applications (but no further approvals after July 16, 2021) and continued renewal requests (permitted to be approved).[20]

**Benefits Provided Under the DACA Program**

17.     DACA confers numerous benefits on those who apply for and are granted DACA status.  Notably, DACA recipients are granted the right not to be arrested or detained based solely on their immigration status during the time period their deferred action is in effect.[21]

18.     DACA recipients are also eligible for work authorization.  As USCIS has explained, "an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action . . . ."[22]

19.     DACA recipients are eligible to receive certain public benefits.  These include Social Security, retirement, and disability benefits, and, in certain states, benefits such as driver's licenses,

---

[17]  Ex. G, at 136 & App'x I (DHS National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA) (Aug. 28, 2013)) (hereinafter, "DACA SOP").

[18]  *Id*. at 136 & App'x I.

[19]  *Texas v. United States*, No. 1:18-CV-00068, 2021 WL 3025857 (S.D. Tex. July 16, 2021).

[20]  *Id.* at *42.

[21]  *See* Ex. B, at 5 (USCIS DACA FAQs, Question 9) ("[I]f an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended."); Ex. D, at 2 (2012 DACA Memorandum); *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1059 (9th Cir. 2014) ("DHS considers DACA recipients not to be unlawfully present in the United States because their deferred action is a period of stay authorized by the Attorney General.").

[22]  Ex. B, at 2 (USCIS DACA FAQs, Question 1).

unemployment insurance, and state-subsidized work-study programs.[23]   In Washington, DACA holders are also eligible for certain state financial aid programs and state-funded food assistance.[24]

20.     DACA serves as a gateway to numerous other benefits, and enables recipients to open bank accounts, obtain credit cards, start businesses, purchase homes and cars, and conduct other aspects of daily life that are otherwise often unavailable for undocumented immigrants.[25]

21.     DACA has enabled hundreds of thousands of Dreamers to "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books."[26]

22.     DACA also confers other immigration benefits and the ability to travel.  For example, DACA recipients do not accrue time under Section 212(a)(9)(B)(i) of the Immigration and Nationality Act ("INA"),[27] and can briefly depart the United States and legally return under certain circumstances.[28]

**The Government's Promise to Dreamers**

23.     When the DACA program was first launched, many Dreamers were reluctant to voluntarily disclose information that could help facilitate their removal from the United States.  To combat this fear, DHS repeatedly promised applicants that information they provided as part of the DACA application process would "not later be used for immigration enforcement purposes."[29]

24.     The government reiterated this commitment in its correspondence with Dreamers.  Moreover, the approval notice granting deferred action under DACA lists only "fraud or

---

[23]   *See* 8 U.S.C. §§ 1611(b)(2)–(3), 1621(d); *Texas v. United States*, 809 F.3d 134, 148 (5th Cir. 2015); *Ariz. Dream Act Coal.*, 81 F. Supp. 3d at 811; *Texas*, 2021 WL 3025857, at *3 (citing Tex. Educ. Code § 56.075(a)(1); 19 Tex. Admin. Code § 21.24(d)(5)).

[24]   *See* Wash. Rev. Code § 28B.92.010; Wash. Admin. Code §§ 388-400-0050, 388-424-0001, 388-424-0030.

[25]   *See Ramirez*, Dkt. #38-1, at 2 (Amicus Curiae Brief of United We Dream).

[26]   Ex. C, at 2 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

[27]   8 U.S.C. § 1182(a)(9)(B)(i).

[28]   Ex. B, at 19 (USCIS DACA FAQs, Question 57).

[29]   Ex. C, at 1 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

misrepresentation" in the application process or "[s]ubsequent criminal activity" as grounds for revoking DACA.[30]

25.    The government's commitment to the DACA program is further codified in its publication entitled "National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA)."[31]  This document effectively limits the exercise of agency discretion with respect to DACA with "nearly 150 pages of specific instructions for granting or denying deferred action." *Texas*, 809 F.3d at 173 (citation omitted).

26.    Numerous public officials from both political parties have reinforced this promise, and have recognized that Dreamers have relied on the government to keep its word.  For example, in December 2016, then-Secretary of Homeland Security Jeh Charles Johnson acknowledged that there are 750,000 Dreamers who have "relied on the U.S. government's representations" about DACA, and asserted that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."[32]

27.    In January 2017, then-Speaker of the House Paul Ryan stated that the government must ensure that "the rug doesn't get pulled out from under" Dreamers, who have "organize[d] [their] li[ves] around" the DACA program.[33]

28.    In February 2017, Congressman Raúl Grijalva described DACA as a "commitment," and called for "the federal government to honor its word to protect" Dreamers.[34]

29.    On March 29, 2017, then-Secretary of Homeland Security John Kelly reaffirmed that "DACA status" is a "commitment . . . by the government towards the DACA person, or the so-called Dreamer."[35]

---

[30]  Ex. H (DACA Approval Notice).

[31]  Ex. G (DACA SOP).

[32]  Ex. C, at 1 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016)).

[33]  Transcript of CNN Town Hall with Speaker Paul Ryan, CNN (Jan. 12, 2017), http://cnn.it/2oyJXJJ.

[34]  Congressional Progressive Caucus Leaders Respond to ICE Arrest of DACA Recipient (Feb. 16, 2017), https://cpc-grijalva.house.gov/press-releases/congressional-progressive-caucus-leaders-respond-to-ice-arrest-of-daca-recipient.

[35]  Ted Hesson & Seung Min Kim, *Wary Democrats Look to Kelly for Answers on Immigration*, Politico (Mar. 29, 2017), http://politi.co/2mR3gSN.

30.     On April 21, 2017, President Trump confirmed that his administration's policy is not to deport Dreamers, and suggested that "[D]reamers should rest easy."[36]

31.     During his presidential campaign in 2019 and 2020 and after his November 2020 election victory, President Biden pledged to "remove the uncertainty for Dreamers by reinstating the DACA program."[37]

32.     On March 26, 2021, Secretary of Homeland Security Alejandro Mayorkas stated his department "is taking action to preserve and fortify DACA."[38]   On September 28, 2021, DHS published its proposed rule, which codifies original DACA eligibility requirements and certain policies in an attempt to protect the DACA program.[39]

**The Government Determines On Three Separate Occasions That Mr. Ramirez Does Not Pose A Threat To Public Safety or National Security**

33.     In late 2013, Mr. Ramirez first applied for deferred action and work authorization pursuant to DACA.  As part of this process, Mr. Ramirez provided the government with his birth certificate, school records, and information about where he lived, and was required to attend a biometrics appointment so that USCIS could take his fingerprints and photographs.  Mr. Ramirez was nervous about providing this information, but trusted that the government would keep its word. Mr. Ramirez was granted deferred action and work authorization in 2014 after DHS determined that he posed no threat to public safety or national security.

34.     In 2015, USCIS conducted an additional screening of all individuals granted deferred action under DACA—including Mr. Ramirez—"to identify records that contained information

---

[36]  Excerpts from AP interview with President Donald Trump, The Associated Press (Apr. 21, 2017), https://apnews.com/182009c26d70499a97d486afa8d7a34d.

[37]  Joe Biden on Immigration, https://joebiden.com/immigration/#; Inside Higher Ed, 'They Are Americans Now' (November 10, 2020), https://www.insidehighered.com/news/2020/11/10/president-elect-biden-has-pledged-reinstate-daca.

[38]  Department of Homeland Security, Statement by Homeland Security Secretary Mayorkas on DACA (March 26, 2021), https://www.dhs.gov/news/2021/03/26/statement-homeland-security-secretary-mayorkas-daca.

[39]  Deferred Action for Childhood Arrivals, 86 Fed. Reg. 53736 (proposed Sept. 28, 2021), https://www.federalregister.gov/documents/2021/09/28/2021-20898/deferred-action-for-childhood-arrivals.

indicating known or suspected gang association."[40]   USCIS did not take any action against Mr. Ramirez in connection with this additional screening.

35.     In 2016, Mr. Ramirez reapplied for DACA, and once again was granted deferred action and work authorization after being subject to rigorous vetting.  As part of this process, the government sent Mr. Ramirez an approval notice (the "2016 DACA Approval Notice") informing him that his request for deferred action had been granted.  The 2016 DACA Approval Notice provides that "[u]nless terminated, this decision to defer removal action will remain in effect for 2 years" and is valid to May 4, 2018.[41]   The 2016 DACA Approval Notice informed Mr. Ramirez that his deferred action could be terminated if he engaged in "[s]ubsequent criminal activity."[42]

36.     DHS has therefore confirmed on three separate occasions prior to Mr. Ramirez's unlawful arrest that Mr. Ramirez did not pose a threat to national security or public safety—first in 2014 when he applied for DACA, then again in 2015 when USCIS conducted an additional screening of all DACA beneficiaries, and finally in 2016 when he reapplied for DACA.

**Mr. Ramirez's Unconstitutional Arrest and Subsequent Interrogation**

37.     On February 10, 2017, at approximately 9:00 a.m., a team of ICE agents arrested Mr. Ramirez's father outside of the apartment where Mr. Ramirez, his father, and his brother were then living.  The ICE agents subsequently entered the apartment; neither Mr. Ramirez nor his brother are aware of any consent to permit the ICE agents to enter or search the premises.

38.     Upon seeing Mr. Ramirez in the apartment, the ICE agents began to question him.  Mr. Ramirez provided the agents with his name and birthdate, and told them that he was born in Mexico.  Without asking any further questions, one of the agents demanded that Mr. Ramirez stand up and turn around.  The agent then place Mr. Ramirez in handcuffs with his arms behind his back in a manner that left marks on his body and caused him pain.

39.     Mr. Ramirez informed the ICE agents that he had the legal right to live and work in the United States, informing the agents on approximately five occasions:  "I have a work permit.  You

---

[40]   Ex. F at 4 ¶ 2 (USCIS Letter).

[41]   Ex. H (DACA Approval Notice).

[42]   Ex. B, at 18 (USCIS DACA FAQs, Question 51).

Gibson, Dunn &
Crutcher LLP

cannot take me." The agents did not respond to Mr. Ramirez's statements. Nor did they respond to Mr. Ramirez's request to see a warrant.

40.     Mr. Ramirez's father also repeatedly informed the ICE agents that Mr. Ramirez had a legal work permit, and questioned why Mr. Ramirez was being detained.

41.     The ICE agents did not ask any questions at the apartment regarding whether Mr. Ramirez was involved with a gang, nor did they ask him about his tattoo. Rather, the ICE agents arrested and detained Mr. Ramirez based solely on the fact that he had been born in Mexico.

42.      The ICE agents did not have an arrest warrant for Mr. Ramirez, nor did they have any reason to believe that he had committed a crime or was not authorized to be in the United States. On the contrary, the ICE agents had reason to know that Mr. Ramirez had a work permit and was therefore lawfully living and working in the United States. Despite these facts, Mr. Ramirez was taken into custody and transported to an ICE holding facility in Tukwila, Washington.

43.     At the holding facility, the ICE agents confiscated Mr. Ramirez's work permit. This permit was marked with a "C33" designation, which clearly identified Mr. Ramirez as a DACA recipient with work authorization pursuant to DACA.[43]

44.     The ICE agents also fingerprinted Mr. Ramirez and used this information to access his records, which revealed that Mr. Ramirez has no criminal history, had twice been granted DACA status, and possessed valid employment authorization through May 4, 2018.

45.     The ICE agents refused to release Mr. Ramirez even after it confirmed his DACA status. When Mr. Ramirez again protested that he had a work permit, he was told that it did not matter because he "was not from the United States." The ICE agents subsequently cited Mr. Ramirez's receipt of DACA as evidence of his "illegal" status in the Form I-213.[44]

46.     The ICE agents then began to interrogate Mr. Ramirez. They asked him at least five times whether he was in a gang, and each time he denied any gang affiliation. The ICE agents repeatedly pressed him as to whether he had ever known anyone who was a gang member.

---

[43] Ex. G, at 116 (DACA SOP) ("To distinguish DACA-related EADs from other deferred action EADs, the (c)(33) code will be used.").

[44] *Ramirez*, Dkt. #93, at 29 (ICE CAR 000028 (I-213 Record of Deportable/Inadmissible Alien (Feb. 10, 2017))).

Mr. Ramirez told the agents that although that he knew students who had attended middle school and high school with him who were in gangs, he was not gang affiliated and never had been.

47.     The ICE agents also interrogated Mr. Ramirez about the tattoo on his forearm.  Mr. Ramirez obtained this tattoo when he was 18 years old—before he first applied for DACA.  The tattoo consists of the words "La Paz – BCS" and a nautical star.  "La Paz" is Mr. Ramirez's birthplace, and "BCS" stands for Baja California Sur, the region in which La Paz is located.  Mr. Ramirez decided to include the city of his birth because he had seen others do the same, and ultimately selected the nautical star (rather than a whale's tail, which he had also considered) because he liked the way it looked. Nautical stars are popular symbols for tattoos.

48.     During the interrogation, one of the ICE agents stated that if Mr. Ramirez was from Fresno, he was "definitely a gang member" because everyone in Fresno is a member of the "bulldogs" gang.  He said that Mr. Ramirez's tattoo was a "bulldogs" tattoo.  Mr. Ramirez repeatedly told the ICE agents that the tattoo is not a gang tattoo, but they refused to believe him.

49.     The ICE agents also asked Mr. Ramirez if there were any gangs with which he would like to avoid being placed for his safety.  Mr. Ramirez again stated that he had no gang affiliation and would not have problems being placed with anyone.  Upon continued questioning, Mr. Ramirez ultimately indicated that if he had to be placed with any group, he would prefer "the Paisas."  Mr. Ramirez understands the colloquial use of "Paisas" to mean Mexicans, and was attempting to communicate that if given the option, he would prefer to be placed with other Mexicans.  Mr. Ramirez, who has no criminal convictions and was never previously in custody, has no connection or affiliation whatsoever to the Paizas gang.

**Mr. Ramirez's Unconstitutional Detention**

50.     Mr. Ramirez was then transferred to Northwest Detention Center, where he remained in custody for the next 47 days.

51.     The Northwest Detention Center is a privately owned detention facility located on a

contaminated "Superfund" site.[45]   According to the Environmental Protection Agency, industrial pollutants have been found in the soil and water near the Northwest Detention Center, and environmental remediation efforts at the site remain ongoing.[46]

52.   In April 2017, hundreds of detainees at the Northwest Detention Center went on a hunger strike to protest the inhumane conditions at the facility, including poor hygiene, lack of access to medical care, lack of recreational opportunities, poor quality food, and unreasonable commissary prices.[47]

53.   The more than six weeks that Mr. Ramirez spent at the Northwest Detention Center were extremely difficult for him.  He spent his twenty-fourth birthday in detention, and was unable to see or speak to his young son for the duration of his detention.  Mr. Ramirez had difficulty sleeping, and experienced significant distress, sadness, fear, and anxiety as a result of his unjust detention.  Mr. Ramirez also experienced vision problems, and was informed by the medical staff at the Northwest Detention Center that this was likely due to depression.

54.   The government classified Mr. Ramirez as a "medium-high" security risk, and placed him in a housing unit with gang members and dangerous criminals.  Mr. Ramirez requested that he be reclassified because, as he again explained, he was not, and never had been, gang affiliated, but this request was denied.  Because of the government's false statements to the media, many of the detainees at the Northwest Detention Center believed that Mr. Ramirez was a gang member and questioned him about his gang affiliation.  This caused Mr. Ramirez to fear for his personal safety, and he was afraid to leave his cell out of fear that he would be assaulted.

**The Government Revokes Mr. Ramirez's DACA Status and Work Authorization**

---

[45]   U.S. Envtl. Prot. Agency, Fourth Five-Year Review Report for Commencement Bay Nearshore/Tideflats Superfund Site, Pierce Cty., Wash., at vi (Dec. 1, 2014), https://semspub.epa.gov/work/HQ/181285.pdf.

[46]   *Id.* at vi–vii.

[47]   Mike Carter, *Hundreds of immigrant detainees at Tacoma ICE facility on hunger strike, activists say*, The Seattle Times (Apr. 12, 2017), http://www.seattletimes.com/seattle-news/group-hundreds-of-detainees-at-tacoma-ice-facility-on-hunger-strike; Steve Miletich, *ICE: Hunger strike winding down at Tacoma immigration detention center*, The Seattle Times (Apr. 14, 2017), http://www.seattletimes.com/seattle-news/crime/ice-hunger-strike-abates-at-detention-center.

55.     The government issued a Notice to Appear ("NTA") on February 10, 2017.[48]  The government asserted that Mr. Ramirez's DACA status terminated on the day the NTA was issued.[49]

56.     USCIS sent Mr. Ramirez a Notice of Action ("NOA") dated February 17, 2017.  The NOA states that Mr. Ramirez's deferred action and employment authorization terminated on the date the NTA was issued, and provides that "[a]n appeal or motion to reopen/reconsider this notice of action may not be filed."[50]

57.     Under DHS policy, the government must provide a "Notice of Intent to Terminate" and 33 days for a response prior to terminating DACA status, unless the case involves an "Egregious Public Safety" issue.[51]  Mr. Ramirez was never provided with a Notice of Intent to Terminate, nor was he given 33 days to respond to such a notice or otherwise contest the revocation of his DACA status or work permit.

**After Mr. Ramirez Seeks Relief In This District, The Government Launches A Campaign To Smear Mr. Ramirez's Reputation and To Strip Him Of His DACA Status**

58.     On February 13, 2017, Mr. Ramirez filed a petition for a writ of habeas corpus in this District seeking an order requiring the government to release him from detention.  *See Medina v. United States Department of Homeland Security* ("*Ramirez*"), No. 17-cv-218 (W.D. Wash.), Dkt. 1.

59.     Thereafter, the government launched a campaign to smear Mr. Ramirez's reputation by concocting a false narrative about the circumstances surrounding his arrest and detention.  The government sought to justify its unlawful actions based on the false assertion that Mr. Ramirez is a gang member, and initiated a sustained campaign to publicly vilify him as such, despite knowing that there existed no reliable evidence to support such a characterization.

60.     Spokespersons for ICE and DHS issued statements alleging that Mr. Ramirez was a gang member, and falsely informed the national media that the government possessed "corroborating evidence" to support that allegation.  Additionally, on information and belief, agents of the

---

[48]  *Ramirez*, Dkt. #93, at 7–8 (ICE CAR 000005 (Notice to Appear)).

[49]  *See Ramirez*, Dkt. #32, at 2–3 (Respondents' Brief Regarding the Court's February 14, 2017 Order).

[50]  Ex. I, at 1 (Notice of Action).

[51]  Ex. G, at 136 & App'x I (DACA SOP).

government coordinated with each other and leaked false information to members of the media in furtherance of this smear campaign.

61.     For instance, on February 14, 2017, an ICE spokesperson stated that "ICE officers took Mr. Ramirez into custody *based on* his admitted gang affiliation and risk to public safety."[52]  This false allegation contradicts the Form I-213 prepared by the government, which notes that ICE agents did not discuss Mr. Ramirez's purported gang affiliation with him until *after* he was transported to the ICE holding facility in Tukwila, Washington, at which point his DACA status and lack of a criminal record had been confirmed.[53]

62.     On February 15, 2017, ICE officials were pressed by the news media for additional evidence demonstrating that Mr. Ramirez was a gang member.  In response, the government informed the media that it had "additional evidence including photos and social media content that illustrate his gang affiliation."[54]

63.     On February 15, 2017, an unnamed ICE official informed members of the national news media that there was corroborating evidence to support their allegations of gang membership.[55] No such corroborating evidence was produced or filed in any court, despite requests by Mr. Ramirez and his counsel.

64.     On February 15, 2017, DHS issued a statement labeling Mr. Ramirez as "a gang member."[56]

---

[52]  Sue Horton et al., *Mexican 'DREAMer' Nabbed in Immigrant Crackdown*, Reuters U.S. Top News (Feb. 14, 2017), http://www.reuters.com/article/us-usa-trump-immigration-arrest-exclusiv-idUSKBN15T307 (emphasis added).

[53]  *Ramirez*, Dkt. #93, at 29 (ICE CAR 000028 (I-213 Record of Deportable/Inadmissible Alien (Feb. 10, 2017))).

[54]  *First 100 Days: Chaffetz: We Want Inspector General to Investigate Leaks; Attorney for Arrested 'Dreamer' Speaks Out*, FoxNews.com (Feb. 15, 2017), https://www.foxnews.com/transcript/chaffetz-we-want-inspector-general-to-investigate-leaks-attorney-for-arrested-dreamer-speaks-out.

[55]  '*DREAMer' Protected under Obama Detained in Seattle Area*, CBSnews.com (Feb. 15, 2017), http://www.cbsnews.com/news/daniel-ramirez-medina-dreamer-protected-under-obama-detained-in-seattle.

[56]  *DHS Statement on Arrest of Alien Gang Member in Washington* (Feb. 15, 2017), https://www.dhs.gov/news/2017/02/15/dhs-statement-arrest-admitted-alien-gang-member-washington.

65.     The government has since backed away from these false and defamatory allegations. For example, in filings in this District, the government alleged merely that Mr. Ramirez "hangs out" with gang members.[57]  In the Immigration Court, the government admitted that the evidence does not support any conclusion that Mr. Ramirez is a threat to public safety.

**Mr. Ramirez Is Released from Custody After 47 Days in Detention**

66.     Pursuant to an order of this District in *Ramirez*, Mr. Ramirez received a bond hearing in Immigration Court on March 28, 2017.[58]  At the bond hearing, Mr. Ramirez testified about his arrest, interrogation, and detention.  Mr. Ramirez was released on bond on March 29, 2017.[59]

67.     In a startling admission, counsel for the government conceded at the conclusion of the bond hearing that Mr. Ramirez is not a danger to the community.  The government's statements (and lack of evidence) at the bond hearing affirm that the government has never had any justification for arresting Mr. Ramirez, revoking his DACA status, or detaining him for more than six weeks.

68.     After considering the evidence, the Immigration Court concluded that Mr. Ramirez is neither a flight risk nor a danger to the community and should be released on bond.[60]  The Immigration Court's decision to release Mr. Ramirez underscored the government's inability to support its allegations of gang affiliation.

**The Government Fails to Provide Any Credible Evidence to Support Its Gang Allegations**

69.     Both before and after that bond hearing, the government consistently failed to produce any credible evidence to support their false allegations that Mr. Ramirez is gang affiliated.  In sharp contrast, Mr. Ramirez submitted extensive evidence demonstrating that he is not, and never has been, a gang member.  In addition to evidence demonstrating that he successfully passed three separate DHS background checks, Mr. Ramirez submitted numerous sworn declarations attesting to the fact that he

---

[57]  *E.g.*, *Ramirez*, Dkt. #52, at 7 (Respondents' Motion to Dismiss).

[58]  *See Ramirez*, Dkt. #69, at 3.

[59]  Ex. J, at 1 (Notice to EOIR).

[60]  Ex. K, at 1 (Custody Order); *see also* 8 C.F.R. § 236.1(c)(8) (2017).

Complaint                                                                                          Counsel Listed on Page I
Case No. 2:22-cv-106

Gibson, Dunn &
Crutcher LLP

has never had any gang affiliation.[61]

70.     Additionally, three independent experts rebutted the government's allegations that Mr. Ramirez is gang affiliated.  Martin Flores, who has served as a gang expert in more than 700 cases, stated that he has "never seen a gang member with a similar tattoo nor would [he] attribute this tattoo to have any gang-related meaning."[62]   Another gang expert, Dr. Edwina Barvosa, similarly stated that there is "no apparent evidence that Mr. Ramirez Medina has ever been a gang member himself."[63]   And Carlos García, a Mexican researcher who has written extensively on gangs in California and Central America, noted that "[a]ny argument about gang ties based on [Mr. Ramirez's] tattoo is weak at best; this tattoo does not show any gang affiliation."[64]

71.     Despite the means and ample opportunity to collect evidence to support its claims, the government failed to produce *any* credible evidence to support any of its allegations against Mr. Ramirez.  Unlike Mr. Ramirez, the government had access to numerous (and perhaps all) law enforcement and public safety databases.  Yet, the government never suggested that it had located Mr. Ramirez's name or supposed gang affiliation in any of those databases or records.

72.     To the contrary, the government admitted numerous times that Mr. Ramirez is *not* a public safety threat, including at his March 28, 2017 bond hearing.  And on March 20, 2018, the government determined in an internal email that Mr. Ramirez had "[n]o criminality on rap sheet" and that "there is not sufficient evidence to conclude he is currently known or suspected gang member. . . . There is NOT sufficient evidence to conclude this person is an EPS concern."   The government never informed Mr. Ramirez, the Immigration Court, or the judge presiding over Mr. Ramirez's habeas petition, that they had made this determination.

73.     The government also placed great weight on Mr. Ramirez's alleged "gang tattoo," yet

---

[61]   *E.g.*, *Ramirez*, Dkt. #35-1, ¶¶ 19–20 (Declaration of Daniel Ramirez Medina); *id.*, Dkt. #35-2, ¶ 4 (Declaration of Josue L.); *id.*, Dkt. # 35-3, ¶¶ 8–9 (Declaration of Luz L.); *id.*, Dkt. #35-5, ¶ 8 (Declaration of Nancy L.).

[62]   *Ramirez*, Dkt. #35-7, ¶ 11 (Declaration of Martin M. Flores).

[63]   *Ramirez*, Dkt. #35-8, ¶ 10 (Declaration of Edwina Barvosa, PhD).

[64]   Jonathan Blitzer, *A case that could determine the future for Dreamers*, The New Yorker (Mar. 15, 2017), http://www.newyorker.com/news/news-desk/a-case-that-could-determine-the-future-for-dreamers.

never provided *any* evidence (from an expert or otherwise) that this tattoo is associated with gang membership.  The government was unable to do so because it is not a gang tattoo.  Instead, the government shifted tacks, when, in Immigration Court it submitted "evidence" in the form of articles located on the internet that discuss how some gangs discourage their members from getting tattoos so they are not identified as gang members.  In other words, Defendant first argued Mr. Ramirez's tattoo *was* a gang tattoo, and when that argument collapsed, turned around and argued that a *lack* of gang tattoos actually supports their contention that Mr. Ramirez was gang affiliated.  Not surprisingly, that argument failed as well. In January 2018, the Immigration Court found that "[Mr. Ramirez] was not in a gang, nor associated with one."

74.     Then, at a May 1, 2018 hearing in the *Ramirez* proceedings in this District, the government stated that there is no "record that establishes, one way or the other, with absolute conclusiveness, about Mr. Ramirez's gang affiliations or lack thereof."  Remarkably, the government made that statement at a time when its own records *did* show that Mr. Ramirez lacked gang affiliation—as confirmed by the government's March 20, 2018 internal email stating "there is not sufficient evidence to conclude [Mr. Ramirez] is currently a known or suspected gang member."[65]

**The Government Is Twice Enjoined from Revoking Mr. Ramirez's DACA Status and Work Authorization**

75.     On January 17, 2018, the Immigration Court issued an order of removal directing Mr. Ramirez's return to Mexico, while also finding that "[Mr. Ramirez] was not in a gang, nor associated with one."[66]

76.     On February 6, 2018, Mr. Ramirez filed a motion for a preliminary injunction to restore his DACA and work authorization (the "Preliminary Injunction Motion") in *Ramirez*.[67]

77.     While Mr. Ramirez's Preliminary Injunction Motion was pending, a preliminary injunction issued in a separate proceeding, *Inland Empire-Immigrant Youth Collective v. Nielsen*

---

[65]  Ex. A (Mar. 20, 2018 USCIS Email).

[66]  *See Ramirez*, Dkt. #122-1, at 35 (Third Supplemental Declaration of Daniel Ramirez Medina); *id.*, Dkt. #124-1, p. 14 (Excerpt of Trans. of Oral Decision of Immigration Court).

[67]  *See Ramirez*, Dkt. #122 (Plaintiff's Motion for Preliminary Injunction).

Gibson, Dunn & Crutcher LLP

("*Inland Empire* Order"), No. 17-cv-2048 (C.D. Cal.), on February 26, 2018.  That order required the government to restore to a certified class of former DACA recipients their DACA status and work authorization.  As a member of the *Inland Empire* class, Mr. Ramirez was to have his DACA restored.

78.     On or about April 3, 2018, the government delivered two notices to Mr. Ramirez. One notice informed Mr. Ramirez that his DACA status and work authorization had been reinstated and extended to May 5, 2018, pursuant to the *Inland Empire* Order.[68]  The second notice, a Notice of Intent to Terminate ("NOIT"), initiated proceedings to terminate his just-restored DACA status.[69]  In other words, faced with the *Inland Empire* Order, the government restored Mr. Ramirez's status only to immediately begin new proceedings to wrongfully strip him of that status.

79.     The government's stated basis for the issuance of the NOIT was its continued wrongful insistence that Mr. Ramirez posed a risk to public safety because he allegedly was gang affiliated.  This theory was inconsistent with multiple background checks the government had previously run in connection with Mr. Ramirez's DACA application and renewals, the government's concession at his March 28, 2017 bond hearing that it had no evidence to support a finding that Mr. Ramirez was a risk to public safety,[70] and the Immigration Court's January 2018 finding that Mr. Ramirez does not present a risk to public safety because the evidence submitted showed he was "not in a gang, nor associated with one."[71]  The government's stated basis for the NOIT also flatly contradicted its own internal March 2018 email assessment conceding Mr. Ramirez lacks any gang affiliation or criminal history.[72]  The NOIT also stated that termination of Mr. Ramirez's DACA status was warranted because ICE was "actively pursuing" his removal, even though a removal order in and of itself is not a sufficient basis for termination of DACA status.

80.     On May 15, 2018, Mr. Ramirez's Preliminary Injunction Motion was granted.  The *Ramirez* Court held that Mr. Ramirez is likely to succeed on the merits of his claims because the

---

[68]   *See* Ex. L, at 1 (Reinstatement Notice).

[69]   *See* Ex. M, at 1 (Notice of Intent to Terminate).

[70]   *See Ramirez*, Dkt. #122-1, at 31 (Mar. 28, 2017 Tr. of Oral Decision of I.J.).

[71]   *See Ramirez*, Dkt. #124-1, at 14 (Jan. 17, 2018 Tr. of Oral Decision of I.J.).

[72]   Ex. A (March 20, 2018 USCIS Email).

government's continued reliance on "unfounded allegations" of gang affiliation was arbitrary, capricious, and an abuse of discretion and also implicated Mr. Ramirez's constitutional "right to an opportunity to be heard in a meaningful matter."[73]   The remaining elements—irreparable harm, balance of hardships and the public interest—also favored preliminary injunctive relief.

81.     Consistent with these rulings, the *Ramirez* Court entered its Preliminary Injunction Order, in which it ordered that (1) "Defendants shall not terminate Plaintiff's DACA status and work authorization pending a final decision by this Court on the merits of his claims" and (2) "Defendant USCIS is ENJOINED from asserting, adopting, or relying in any proceedings on any statement or record made as of this date purporting to allege or establish that Mr. Ramirez is a gang member, gang affiliated, or a threat to public safety."[74]

**The Government Denies Mr. Ramirez's DACA Renewal Application**

82.     On May 21, 2018, Mr. Ramirez submitted a request to the government to renew his DACA status and work authorization in an abundance of caution given that *Ramirez* had already enjoined the government from terminating his benefits.   Notwithstanding the Preliminary Injunction Order, on September 26, 2018, the government issued a Notice of Intent to Deny ("NOID") that request.   The NOID stated that the government intended to deny Mr. Ramirez's renewal request for four reasons.   The first—that ICE was actively pursuing Mr. Ramirez's removal—simply repeated one of the bases for the prior NOIT that *Ramirez* enjoined and is deficient for the reasons described above. Each of the other three attempted to portray Mr. Ramirez as a threat to public safety: (1) that he was reported for having sexual intercourse with his son's mother in 2013 (resulting in the conception of his son), when he was 20 years old and his son's mother was 17 years old, even though no charges were filed, the relationship was consensual, and both sets of parents approved of the relationship and the pregnancy that resulted therefrom; (2) Mr. Ramirez's own admission that he was cited for possession of a small quantity of marijuana in Oregon in 2014; and (3) that he has not fully paid off certain fines he incurred for traffic violations.   None of these other three grounds was

---

[73]   *Medina v. Dep't of Homeland Sec.*, 313 F. Supp. 3d 1237, 1251 (W.D. Wash. 2018) (internal quotations omitted); *see also Ramirez*, Dkt. #133, at 22–23 (Preliminary Injunction Order).

[74]   *Id.* at 23.

previously cited by the government as a basis for terminating Mr. Ramirez's DACA status and work authorization, although *each was previously known* to the government at the time it renewed Mr. Ramirez's DACA in 2016—at which time it did not determine any to be a basis for denial of renewal—and certainly at the time it issued the NOIT.   None of these bases suggested that Mr. Ramirez posed a public safety concern, and none established an adequate basis for termination of his DACA status.   Indeed, USCIS conceded in its internal March 20, 2018 email describing his "current criminal history"—sent two months *after* it claimed it learned for the first time of the "offense history" that it now cites for denial—that Mr. Ramirez's file shows "no criminality" and that "[t]here is NOT sufficient evidence to conclude [he] is an [egregious public safety] concern."[75]   Instead, these bases for denial of renewal—particularly when set in the context of the government's continuing campaign against Mr. Ramirez—were yet another unlawful attempt to terminate his DACA.

83.   On October 24, 2018, Mr. Ramirez submitted his lengthy response to the NOID, objecting to the stated bases for denial of DACA renewal, providing evidence of the harm such denial would cause him, and explaining that doing so would be a violation of the Preliminary Injunction Order.

84.   On December 19, 2018, USCIS issued its final "Decision," denying Mr. Ramirez's DACA renewal application for the reasons contained in the NOID.[76]   Despite the Preliminary Injunction Order's mandate that the government not rely on pre-existing public-safety records, or terminate Mr. Ramirez's DACA pending a final decision on his claims, USCIS effectively did just that, denying renewal of Mr. Ramirez's DACA (in effect, a termination), even though such processed renewals are routinely approved 99% of the time.

**Mr. Ramirez Has Suffered and Continues to Suffer Harm as a Result of Defendant's Unlawful Conduct**

85.   Mr. Ramirez was detained from February 10, 2017 to March 29, 2017.   He will never get back the six weeks that he spent in the Northwest Detention Center away from his son.   Since his release, Mr. Ramirez has reunited with his family, but has been unable to fully piece his life back

---

[75]   Ex. A (Mar. 20, 2018 USCIS Email).

[76]   Ex. N (Dec. 19, 2018 Decision Denying DACA Renewal).

together.  Mr. Ramirez must work to provide for himself and his family, but the government's actions have impaired his ability to find steady employment.

86.     Mr. Ramirez also continues to experience the profound emotional and psychological consequences of his detention.  For more than six weeks, he was confined under conditions that caused him to experience significant distress, humiliation, embarrassment, discomfort, fear, and anxiety.  He constantly feared that he would be attacked based on the government's false claims about his supposed gang affiliation.

87.     Mr. Ramirez also continues to suffer the stigma of being associated with a gang.  Ever since the government leveled those false accusations against Mr. Ramirez, people have treated him differently.  Not only has Mr. Ramirez's reputation been damaged as a result of the government's conduct, but the reputation of his family has suffered as well.  Mr. Ramirez cares deeply about his family, and it has been very difficult for him to see how the government's actions have caused his family harm.

88.     Further, Mr. Ramirez has suffered harm and significant distress arising out of both the unlawful issuance of the NOID and subsequent final Decision to deny his DACA renewal request. The government's relentless pursuit of Mr. Ramirez and denial of his DACA renewal have caused him great additional emotional harm, have interfered with his ability to earn a living wage, to enjoy the other benefits of DACA status, to raise his son (who is a U.S. citizen), and to peacefully carry on living his life in the United States.

## CAUSES OF ACTION

## <u>COUNT ONE</u>

## FALSE ARREST

89.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

90.     By reason of the conduct of the Defendant, as herein alleged, Mr. Ramirez was arrested on February 10, 2017 without a warrant, probable cause, or Mr. Ramirez's consent.  Defendant arrested Mr. Ramirez despite having been repeatedly informed that Mr. Ramirez—a "Dreamer" who was twice granted deferred action and work authorization under the DACA program—possessed a legal

right to live and work in the United States.  Defendant had no reason to believe that Mr. Ramirez had committed a crime or was not authorized to be in the United States.  Mr. Ramirez and his family repeatedly told Defendant that he had a legal work permit and questioned why Mr. Ramirez was being arrested.  Defendant offered no explanation.  Defendant—based solely on Mr. Ramirez's name and the truthful statement that he was born in Mexico—handcuffed Mr. Ramirez, forcibly removed him from a private residence, and transported him to an ICE detention facility in Tukwila, Washington where he was coercively interrogated.

91. As a direct and proximate result of the acts of Defendant, Mr. Ramirez suffered harm, including the loss of his liberty and significant distress and anxiety.

92. As a further direct and proximate result of the acts of Defendant, Mr. Ramirez's work permit was confiscated while at the holding facility.  The work permit clearly identified Mr. Ramirez as a DACA recipient with work authorization pursuant to DACA based on the "C33" designation on the work permit.  Despite this further confirmation in the form of valid government documents that Mr. Ramirez was authorized to live and work in the United States under the DACA program, Defendant continued to refuse to release Mr. Ramirez.  Defendant's only explanation when faced with the work permit was that the work permit did not matter because Mr. Ramirez was not from the United States.

93. Under the FTCA, the United States is liable to Mr. Ramirez for the aforementioned acts.

## COUNT TWO

### FALSE IMPRISONMENT

94. Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

95. By reason of the conduct of the Defendant, as herein alleged, Mr. Ramirez was deprived of his rights, privileges, and immunities secured to him by the Constitution of the United States of America and laws including, but not limited to, the Fourth Amendment, when United States government employees, detained and exercised control and direction over Mr. Ramirez while the government employees entered Mr. Ramirez's residence without permission, without a warrant, and without probable cause and subsequently arrested him on February 10, 2017.

96.     As a further direct and proximate result of the acts of Defendant, Mr. Ramirez was detained for 47 days at Northwest Detention Center despite no probable cause to arrest and detain him.

97.     As a further direct and proximate result of the tortious and unconstitutional acts of Defendant, Mr. Ramirez has not been able to find steady work since being detained on February 10, 2017.  His actual loss of earnings will be shown according to proof at time of trial.

98.     As a further direct and proximate result of the acts of Defendant, Mr. Ramirez has not been able to gain employment because DHS and ICE have unlawfully taken Mr. Ramirez's DACA status and work authorization.  DHS and ICE have also refused to return Mr. Ramirez's Washington State identification card, which they confiscated following his arrest.

99.     As a further direct and proximate result of the acts of Defendant, Mr. Ramirez has and continues to experience difficulty sleeping, significant distress, sadness, fear, and anxiety.  He also experienced vision problems while detained at the Northwest Detention Center.

100.     Under the FTCA, the United States is liable to Mr. Ramirez for the aforementioned acts.

## COUNT THREE
### ABUSE OF PROCESS

101.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

102.     By reason of the conduct of the Defendant, as herein alleged, Mr. Ramirez suffered an abuse of process.

103.     Under Washington law, an "[a]buse of process is the misuse or misapplication of the process, after the initiation of the legal proceeding, for an end other than that which the process was designed to accomplish." *Saldivar v. Momah*, 145 Wash. App. 365, 388 (2008).  An abuse of process occurs when the government's conduct demonstrates "(1) the existence of an ulterior purpose to accomplish an object not within the proper scope of the process," and the government performs "(2) an act in the use of legal process not proper in the regular prosecution of the proceedings." *Id.*

104.     As alleged above, the government issued Mr. Ramirez a Notice to Appear ("NTA") (Form I-862) on February 10, 2017, thereby initiating removal proceedings against him.  *See Vargas*

*Ramirez v. United States*, 93 F. Supp. 3d 1207, 1233 (W.D. Wash. 2015).

105.    The government subsequently committed three separate abuses of process.

106.    First, the government repeatedly made statements to the Immigration Court and in related litigation indicating that Mr. Ramirez was in a gang or was affiliated with gang members, even though it knew at the time that those statements were false.

107.    On February 14, 2017, four days after the NTA issued, an ICE spokesperson stated that "ICE officers took Mr. Ramirez into custody based on his admitted gang affiliation and risk to public safety."  The next day, DHS issued a statement referring to Mr. Ramirez as "a gang member." And in subsequent filings made in related litigation proceeding in district court, the government stated that Mr. Ramirez "hangs out" with gang members.

108.    The government knew these statements were false when they were made.  In fact, at a bond hearing just six weeks later, on March 28, 2017, the government conceded that Mr. Ramirez is not a danger to the community, and the Immigration Court concluded that Mr. Ramirez is neither a flight risk nor a danger to the community and should be released on bond.

109.    Second, the government decided at multiple junctures to move forward with the removal proceedings against Mr. Ramirez despite knowing that Mr. Ramirez had DACA status and a valid work permit and was neither a gang member nor a threat to public safety.

110.    The government knew that Mr. Ramirez had DACA status and a valid work permit by February 10, 2017.  The Form I-213 the government prepared documenting Mr. Ramirez's arrest and detention, which is dated February 10, 2017, states that "upon running checks at the office, Officer Hicks discovered that subject had applied for Deferred Action for Childhood Arrival (DACA) on 2/29/2016, as a Mexican citizen who had made an unlawful entry into the United States.  USCIS approved the DACA application on 05/05/2016."  The form also states that "[o]n 12/06/2013, subject was granted DACA by CIS.  Subject currently has a valid Employment Authorization Document, valid until 05/05/2018."

111.    And on March 20, 2018, the government determined in an internal email that Mr. Ramirez had "[n]o criminality on rap sheet" and that "there is not sufficient evidence to conclude he is currently known or suspected gang member. . . .  There is NOT sufficient evidence to conclude this

person is an EPS concern."

112.     Nonetheless, approximately two weeks later, on April 3, 2018, the government initiated the process of terminating Mr. Ramirez's DACA status on the basis that Mr. Ramirez was a gang member.

113.     Third, on December 19, 2018, USCIS denied Mr. Ramirez's request to renew his DACA status on the ground that he poses a risk to public safety, citing an alleged "offense history" that predated the initial approval of his DACA status and the 2016 renewal of that status.

114.     The government knew that Mr. Ramirez posed no risk to public safety at this time. Indeed, the government had determined nine months earlier, in March 2018, that "there is not sufficient evidence to conclude he is currently known or suspected gang member. . . . There is NOT sufficient evidence to conclude this person is an EPS [i.e., Egregious Public Safety] concern."

115.     The evidence that Mr. Ramirez did not pose a threat to public safety was so overwhelming that the district court had enjoined the government from "asserting, adopting, or relying in any proceedings on any statement or record made as of this date purporting to allege or establish that Mr. Ramirez is a gang member, gang affiliated, or a threat to public safety" seven months *before* USCIS cited this false risk as a basis for denying Mr. Ramirez's renewal request.

116.     In undertaking the foregoing acts, the government acted with the improper, ulterior purpose of besmirching Mr. Ramirez's reputation to cover for the fact that it had unlawfully arrested and imprisoned a U.S. resident, and penalizing Mr. Ramirez for defending himself against the government's misconduct.

117.     As a direct and proximate result of the aforementioned acts, Mr. Ramirez has and continues to experience difficulty sleeping, significant distress, sadness, fear, and anxiety.

118.     Under the FTCA, the United States is liable to Mr. Ramirez for the aforementioned acts.

## COUNT FOUR

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

119.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120.     By engaging in the acts described above, federal officials and agents engaged in extreme and outrageous conduct with the intent to cause, or with reckless disregard for the probability of causing, Mr. Ramirez to suffer severe emotional distress as a result of being falsely arrested, falsely imprisoned, falsely and publicly labelled a gang member, having his DACA status repeatedly stripped away, and being the target of the government's vendetta against him.

121.     As a direct and proximate result of the government's conduct, Mr. Ramirez has in fact suffered and still continues to suffer severe emotional distress.  During the course of his detention, Mr. Ramirez was unable to see or speak to his young son.  Mr. Ramirez had difficulty sleeping and experienced significant distress, sadness, fear, and anxiety as a result Defendant's actions.  Mr. Ramirez has experienced vision problems stemming from the government's conduct, and was informed by the medical staff at the Northwest Detention Center that this was likely due to depression.

122.     Under the FTCA, the United States is liable to Mr. Ramirez for the aforementioned acts.

## COUNT FIVE

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

123.     Mr. Ramirez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

124.     The federal officials referenced above had a duty to Mr. Ramirez to act with ordinary care so as not to cause harm or injury to Mr. Ramirez.

125.     The government falsely and publicly alleged that Mr. Ramirez was a gang member, with no supporting evidence to back up that allegation.  The true facts were easily discoverable—and in fact, *were* discovered—by Defendant both during the course of Mr. Ramirez's arrest, interrogation, and confiscation of his work permit, and later in the government's ongoing campaign against him.

126.     The government also coercively interrogated Mr. Ramirez, placed him in dangerous conditions of confinement, and repeatedly stripped away his DACA status—all based on the false premise that he was a gang member.

127.     By engaging in the acts alleged herein, federal officials failed to act with ordinary care and also breached their duty of care to Mr. Ramirez.

128.     As a direct and proximate result of the government's conduct, Mr. Ramirez has in fact suffered and still continues to suffer severe emotional distress.  During the course of his detention, Mr. Ramirez was unable to see or speak to his young son.  Mr. Ramirez had difficulty sleeping and experienced significant distress, sadness, fear, and anxiety as a result Defendant's actions.   Mr. Ramirez has experienced vision problems stemming from the government's conduct, and was informed by the medical staff at the Northwest Detention Center that this was likely due to depression.

129.     Under the FTCA, the United States is liable to Mr. Ramirez for the aforementioned acts.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Ramirez prays that this Court grant the following relief:

(1)  Compensatory damages in the amount of at least $450,000.00, with the ultimate amount to be determined according to proof;

(2)  Punitive damages;

(3)  Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(4)  Any other and further relief that this Court may deem fit and proper.


DATED:  January 31, 2022

Seattle, Washington

Respectfully submitted,

/s/ Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS JR. (CA SBN 132099), *pro hac vice* forthcoming
ETHAN D. DETTMER (CA SBN 196046), *pro hac vice* forthcoming
THAD A. DAVIS (CA SBN 220503), *pro hac vice* forthcoming
KATHERINE M. MARQUART (CA SBN 248043), *pro hac vice* forthcoming
KELSEY J. HELLAND (CA SBN 298888), *pro hac vice* forthcoming
SARAH M. KUSHNER (CA SBN 320077), *pro hac vice* forthcoming

/s/ Mark D. Rosenbaum
PUBLIC COUNSEL
MARK D. ROSENBAUM (CA SBN 59940), *pro hac vice* forthcoming
JUDY LONDON (CA SBN 149431), *pro hac vice* forthcoming
KATHRYN A. EIDMANN (CA SBN 268053), *pro hac vice* forthcoming

/s/ Luis Cortes Romero

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOVO LEGAL GROUP, PLLC
LUIS CORTES ROMERO (CA SBN 310852), *pro hac vice* forthcoming

/s/ Matt Adams
NORTHWEST IMMIGRANT RIGHTS PROJECT
MATT ADAMS (SBN 28287)


Attorneys for Plaintiff